# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

JAVIER BENITO-VICTORIA,

    Petitioner,

v.

BRIAN WILLIAMS, SR., et al.,

    Respondents.

Case No.: 2:17-cv-02606-APG-VCF

**Order**

Javier Benito-Victoria, a Nevada prisoner, filed a counseled petition for writ of habeas corpus under 28 U.S.C. § 2254. I deny Benito-Victoria's habeas petition, deny him a certificate of appealability, and direct the Clerk of the Court to enter judgment accordingly.

## I.    BACKGROUND

Benito-Victoria's convictions arise from events that occurred in Clark County, Nevada between February 1, 1991 and August 31, 1993. ECF No. 8-1 at 2. Gabriella Benito (hereinafter "Gabriella"), who was 22 years old at the time of Benito-Victoria's trial, testified that Benito-Victoria, her uncle, sexually abused her. ECF No. 8-13 at 39-40, 43-44, 51. Gabriella testified that Benito-Victoria "used to take [her] clothes off and touch [her]" and that these incidents occurred when Gabriella was between three and five years old. *Id.* at 51-53. Specifically, Benito-Victoria "would take [Gabriella's] pants off and [her] diaper or [her] pull-up" and "would rub [her] body" and "put his hands on [her] vagina" and inside of her vagina. *Id.* at 53-54. Benito-Victoria also "would rub his hand on [Gabriella's butt] and kind of like squeeze it and put his . . . fingers in there." *Id.* at 54. Further, Benito-Victoria would "unzip his pants and he would have [Gabriella] put . . . [her] hands on his penis" and "would move [her] hand up and down on

it and make [her] hold it." *Id.* at 56.  Benito-Victoria told Gabriella "not to say anything" and would "hit [her] on [her] head" when she would yell and cry. *Id.* at 55.

Following a jury trial, Benito-Victoria was found guilty of four counts of sexual assault with a minor under the age of 14 and three counts of lewdness with a child under the age of 14. ECF No. 11-2.  Benito-Victoria was sentenced to life with parole eligibility after 10 years for each of the sexual assault convictions and 10 years for each of the lewdness convictions. ECF No. 11-12.  Benito-Victoria appealed, and the Supreme Court of Nevada affirmed on November 29, 2012. ECF No. 11-15.  Remittitur issued on December 24, 2012. ECF No. 11-16.

Benito-Victoria filed a counseled state habeas petition and supplement on November 18, 2013 and March 3, 2014, respectively. ECF Nos. 11-17, 11-18.  The state district court denied Benito-Victoria's petition on September 25, 2014. ECF No. 11-20.  He appealed, and the Supreme Court of Nevada reversed and remanded on November 24, 2015, concluding that the district court erred by not conducting an evidentiary hearing. ECF No. 11-23.  A post-conviction evidentiary hearing was held on June 24, 2016. ECF No. 11-25.  The district court again denied Benito-Victoria's petition on September 9, 2016. ECF No. 11-28.  He appealed, and the Nevada Court of Appeals affirmed on August 16, 2017. ECF No. 12-3.  Remittitur issued on September 12, 2017. ECF No. 12-4.

Benito-Victoria filed his counseled federal habeas petition on October 6, 2017, alleging the following violations of his federal constitutional rights: (1) the state district court abused its discretion when it denied his motion for a new trial, and (2) his trial counsel failed to consult and present testimony or evidence of an expert psychologist. ECF No. 1 at 24, 33.  The respondents moved to dismiss Ground 1; I denied the motion. ECF Nos. 7, 15.  The petition is now fully briefed. ECF Nos. 22, 23.

## II.     STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act (AEDPA) sets forth the standard of review generally applicable in habeas corpus cases:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  A state court decision is contrary to clearly established Supreme Court precedent within the meaning of 28 U.S.C. § 2254 "if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court." *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000), and citing *Bell v. Cone*, 535 U.S. 685, 694 (2002)).  A state court decision is an unreasonable application of clearly established Supreme Court precedent within the meaning of 28 U.S.C. § 2254(d) "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 75 (quoting *Williams*, 529 U.S. at 413).  "The 'unreasonable application' clause requires the state court decision to be more than incorrect or erroneous.  The state court's application of clearly established law must be objectively unreasonable." *Id.* (quoting *Williams*, 529 U.S. at 409-10) (internal citation omitted).

3

1    "A state court's determination that a claim lacks merit precludes federal habeas relief so

2 long as 'fairminded jurists could disagree' on the correctness of the state court's decision."

3 *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652,

4 664 (2004)).  The Supreme Court has stated "that even a strong case for relief does not mean the

5 state court's contrary conclusion was unreasonable." *Id.* at 102 (citing *Lockyer*, 538 U.S. at 75);

6 *see also Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (describing the standard as a "difficult to

7 meet" and "highly deferential standard for evaluating state-court rulings, which demands that

8 state-court decisions be given the benefit of the doubt" (internal quotation marks and citations

9 omitted)).

10 **III.    DISCUSSION**

11     **A.     Ground 1**

12         In Ground 1, Benito-Victoria alleges that his federal constitutional rights to due process,

13 a fair trial, to present evidence, to a reliable verdict, and to present a complete defense were

14 violated when the state district court abused its discretion by denying his motion for a new trial,

15 thereby preventing him from presenting evidence that Gabriella fabricated her accusations

16 against him.[1] ECF No. 1 at 24, 27.  In its order affirming Benito-Victoria's conviction, the

17 Supreme Court of Nevada held:

18

19         [1] The respondents argue, in part, that Benito-Victoria provides no federal constitutional
basis supporting a grant of habeas relief, as he contends only that the state district court

20 misapplied Nevada caselaw and Nevada statutes. ECF No. 22 at 7.  The respondents' argument
appears to be correct, in part.  For example, Benito-Victoria argues at length that the state district

21 court applied the wrong standard of Nevada law when deciding his motion for a new trial. *See*
ECF No. 1 at 26-33 (explaining that the state district court should have used the standard in

22 *Hennie v. State*, 968 P.2d 761, 764 (Nev. 1998) (outlining "the general standard for a new trial
based on newly discovered evidence" and the specific standard when the newly discovered

23 evidence is impeachment evidence) to evaluate his motion for a new trial rather than the standard
announced in *State v. Purcell*, 887 P.2d 276, 278 (Nev. 1994) (explaining that "the district court
may grant a motion for a new trial based on an independent evaluation of the evidence")).  To

4

This Court will not set aside the district court's denial of a motion for a new trial absent an abuse of discretion. *See State v. Carroll*, 109 Nev. 975, 977, 860 P.2d 179, 180 (1993).

"Evidence qualifies as newly discovered if 'it could not have been discovered and produced for trial even with the exercise of reasonable diligence.'" *Servin v. State*, 117 Nev. 775, 791, 32 P.3d 1277, 1289 (2001) (quoting *Callier v. Warden*, 111 Nev. 976, 988, 901 P.2d 619, 626 (1995)).  Javier contends that the conversation between S.B. and her sister G.B., the victim, described in S.B.'s affidavit was "not discoverable with reasonable diligence" based on the reasoning in *Mortensen v. State*, 115 Nev. 273, 288, 986 P.2d 1105, 1115 (1999), and thus S.B.'s affidavit is newly discovered evidence.

The conversation between S.B. and G.B. was never disclosed to the defense or the State, despite their multiple interviews with S.B. prior to the trial and examination of her at trial.  Similar to the evidence at issue in *Mortensen*, this conversation was "not discoverable with reasonable diligence" because both parties made several attempts to obtain this, or similar information, and were unable to do so. *Id.* at 288, 986 P.2d at 1115.  However, our inquiry does not end there.

Javier claims that the evidence produced by S.B. in her letter and affidavit impeaches G.B. and, if presented to a jury, may render a different result on retrial. The district court held that S.B. lacked credibility as a witness; therefore, a different result would not be reached on retrial if her affidavit were presented to a jury.

Because the district court is in a better position to assess the credibility of a material witness, this court has held that "[m]atters of credibility . . . remain . . . within the district court's discretion." *Ybarra v. State*, 127 Nev. ___, ___, 247 P.3d 269, 276 (2011).  Additionally, other jurisdictions have determined that the trial court can assess witness credibility or proffered new evidence when ruling on a motion for a

_____

the extent Benito-Victoria claims that the state district court's denial of his motion for a new trial violated Nevada state law, he fails to state a cognizable federal habeas claim. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."); *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990) ("[F]ederal habeas corpus relief does not lie for errors of state law."); *Langford v. Day*, 110 F.3d 1380, 1389 (9th Cir. 1996) ("[A]lleged errors in the application of state law are not cognizable in federal habeas corpus.").

Relatedly, Benito-Victoria urges that the *federal* abuse of discretion standard should be utilized to assess the *state* district court's ruling on his motion for a new trial. *See* ECF No. 1 at 25 (citing *Cooter & Gell v. Hartmax Corp.*, 496 U.S. 384, 405 (1990) (assessing the United States Court of Appeals for the District of Columbia's standard of review regarding a United States District Court's imposition of sanctions in an antitrust action) and *United States v. 4.85 Acres of Land, More or Less, Situated in Lincoln Cnty., Mont.*, 546 F.3d 613, 617 (9th Cir. 2008) (explaining the United States Court of Appeals for the Ninth Circuit's standard of review for a United States District court's evidentiary ruling in a just compensation case)). I decline to do so.

5

new trial based on newly discovered evidence. *See, e.g., Shabazz v. State*, 792 A.2d 797, 806 (Conn. 2002); *Webster v. State*, 699 N.E.2d 266, 269 (Ind. 1998).

Here, the district court found that S.B. lacked credibility.  Before and during trial, she and G.B. were excommunicated from their extended paternal family because of the allegations against Javier.  Following Javier's conviction, G.B. refused her father's requests for leniency at Javier's sentencing.  Then, less than two months after the conviction, S.B. provided an affidavit in which she claimed G.B. fabricated the charges against Javier.  Prior to this affidavit, the sisters were close.  After the affidavit was received, the sisters barely spoke.  At the evidentiary hearing on the motion for a new trial, S.B. testified for the defense, which she had not done during the trial.  Additionally, she was speaking and sitting with her extended paternal family during the hearing, demonstrating she had been accepted back into the family.  Thus, the district court properly determined that S.B. was not a credible witness and that her affidavit would not render a different result probable on retrial. *See Sanborn v. State*, 107 Nev. 399, 406, 812 P.2d 1279, 1284-85 (1991) (setting forth standard for granting motion for new trial based on newly discovered evidence, including that the newly discovered evidence must be "such as to render a different result probable upon retrial").

ECF No. 11-15 at 2-5 (internal footnote omitted).  The Supreme Court of Nevada's rejection of Benito-Victoria's claim was neither contrary to nor an unreasonable application of clearly established law as determined by the Supreme Court of the United States.

Between his trial and the entering of his judgment of conviction, Benito-Victoria moved for a new trial. ECF No. 11-7.  In that motion, Benito-Victoria explained that "approximately a month and a half after trial, [Gabriella's] sister, Azucena Benito, delivered a letter to Mr. Benito-Victoria's trial counsel." *Id.* at 4.  That letter—the contents of which appear to have been made into an affidavit—provided as follows:

A couple of years ago when my Uncle Javier was first accused and taken under arrest, my sister confessed something to me that I tried to keep out of my mind and eventually forgot about it until a few months ago.  My sister, Garbriela [sic], and I had a conversation where we were releasing our grief with each other.  She was very emotional and crying and said she wished she would stop everything that was going on with the situation and the trial and etc.  I asked her why she could not just stop it and she responded, "If I tell them I lied now, I will get punished."  I was in shock from both parts of this response she made; "lied"?  And "[You] will get punished…"?  When I asked why she would get punished, she was referring to

6

1  perjury and for the "waste" of money that had been put into the case during that
2  point in time.

3  *Id.* at 11.  Benito-Victoria requested "a new trial based on this newly discovered impeachment
4  evidence." *Id.* at 5.

5        An evidentiary hearing was held on Benito-Victoria's motion on July 15, 2011. *See* ECF
6  No. 11-9 at 2.  Azucena Benito (hereinafter "Azucena") testified that Gabriella "told [her] that
7  she didn't like what was going on [with Benito-Victoria] and that she wished she could take it
8  back." ECF No. 2-3 at 28, 30.  Azucena asked Gabriella why she did not just make it stop, and
9  Gabriella responded that "if [she] told 'em [she] lied now, [she would] get punished . . . for
10 perjury." *Id.* at 31.  Azucena did not testify about this information at Benito-Victoria's jury trial
11 even though she was a witness because she thought she may have misunderstood her sister, did
12 not want to get involved, "never thought things would get th[at] far," and "didn't want to hurt
13 Gabby." *Id.* at 33, 41.  During cross-examination, Azucena testified that her family members did
14 not speak to Gabriella or her following the accusations against Benito-Victoria, but the family
15 had since begun talking to Azucena again after she "brought forth this affidavit." *Id.* at 36.
16 Azucena did not tell the State or the defense about this conversation with Gabriella in any pre-
17 trial meetings. *Id.* at 41.

18       Gabriella testified after her sister at the evidentiary hearing. ECF No. 2-3 at 45.  She
19 testified that she never told her sister that she lied about what was going on with Benito-Victoria
20 or lied in court. *Id.* at 46.  When the State asked her if she "ever [told her] sister that [she]
21 perjured [her]self," Gabriella responded, "[w]hat's perjure?" *Id.*  Gabriella also explained that
22 following Benito-Victoria's trial, her father's "only concern was to try to convince [her] to drop
23 charges." *Id.* at 51.

1    The state district court denied the motion, finding that "Benito-Victoria did not meet his

2    burden under NRS 176.515 to show he is entitled to a new trial" because "Benito-Victoria did

3    not present newly discovered evidence that was credible." ECF No. 11-13 at 5-6.

4         "The right of an accused in a criminal trial to due process is, in essence, the right to a fair

5    opportunity to defend against the State's accusations." *Chambers v. Mississippi*, 410 U.S. 284,

6    294 (1973); *see also Washington v. Texas*, 388 U.S. 14, 19 (1967) (explaining that an accused

7    "has the right to present his own witnesses to establish a defense" and that "[t]his right is a

8    fundamental element of due process of law"); *DePetris v. Kuykendall*, 239 F.3d 1057, 1062 (9th

9    Cir. 2001) ("The Supreme Court has made clear that the erroneous exclusion of critical,

10   corroborative defense evidence may violate both the Fifth Amendment due process right to a fair

11   trial and the Sixth Amendment right to present a defense.").  "[T]he Constitution [also]

12   guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'"

13   *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (quoting *California v. Trombetta*, 467 U.S. 479,

14   485 (1984)).  A defendant's opportunity to be heard "would be an empty one if the State were

15   permitted to exclude competent, reliable evidence . . . when such evidence is central to the

16   defendant's claim of innocence." *Id.*  This is because, "[i]n the absence of any valid state

17   justification, exclusion of . . . exculpatory evidence deprives a defendant of the basic right to

18   have the prosecutor's case encounter and 'survive the crucible of meaningful adversarial

19   testing.'" *Id.* at 690-91 (quoting *United States v. Cronic*, 466 U.S. 648, 656 (1984)).  That being

20   said, the Supreme Court has "never questioned the power of States to exclude evidence through

21   the application of evidentiary rules that themselves serve the interests of fairness and

22   reliability—even if the defendant would prefer to see that evidence admitted." *Id.* at 690.

23

To be sure, Azucena's affidavit might have been helpful defense evidence at a new trial due to its alleged ability to discredit Gabriella's testimony.  However, even if Azucena's affidavit was exculpatory, it cannot be concluded that Benito-Victoria's constitutional rights were violated by the state district court's denial of his motion for a new trial to present the evidence—the affidavit and corresponding testimony—to a jury.  The court determined that Nevada law did not entitle Benito-Victoria to a new trial. *See* ECF No. 11-13 at 5-6 (citing Nev. Rev. Stat. § 176.515(1) ("The court may grant a new trial to a defendant if required as a matter of law or on the ground of newly discovered evidence.")).  The Supreme Court of Nevada, the final arbiter of Nevada law, affirmed Benito-Victoria's convictions, determining that the district court properly denied the motion for a new trial according to Nevada law. *See* ECF No. 11-15 at 4-5 (citing *Sanborn v. State*, 812 P.2d 1279, 1284-85 (Nev. 1991) (setting forth Nevada's standard for granting a motion for new trial based on newly discovered evidence)).  Because the district court determined that the evidence did not meet the standards required by Nev. Rev. Stat. § 176.515(1), thereby constituting a valid state justification for denying the motion for a new trial (*see Crane*, 476 U.S. 690-91), I cannot conclude that Benito-Victoria's right to present a complete defense, right to due process, and right to a fair trial were violated. *Chambers*, 410 U.S. at 294; *Trombetta*, 467 U.S. at 485.

Because the Supreme Court of Nevada reasonably denied Benito-Victoria's claim, I deny Benito-Victoria federal habeas relief for Ground 1.

**B.    Ground 2**

In Ground 2, Benito-Victoria argues that his trial counsel failed to consult and present expert testimony or evidence regarding Gabriella's state of mind, in violation of his Sixth Amendment rights. ECF No. 1 at 33.  Specifically, he asserts that his trial counsel should have

sought evidence about the scientific impact of infantile amnesia and misleading post-event

information. *Id.*  He elaborates that these concepts were relevant to his defense because Gabriella

was three years old when she alleges the sexual abuse took place, and she did not come forward

to report the alleged abuse for seventeen years. *Id.* at 40.  In its order affirming the denial of

Benito-Victoria's state habeas petition, the Nevada Court of Appeals held:

> Benito-Victoria contends the district court erred by denying his claim that trial
> counsel was ineffective for failing to obtain the services of a forensic psychology
> memory expert.  To prove ineffective assistance of counsel, a petitioner must
> demonstrate counsel's performance was deficient in that it fell below an objective
> standard of reasonableness, and resulting prejudice such that there is a reasonable
> probability, but for counsel's errors, the outcome of the proceedings would have
> been different. *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984); *Warden v.
> Lyons*, 100 Nev. 430, 432-33, 683 P.2d 504, 505 (1984) (adopting the test in
> *Strickland*).  Both components of the inquiry must be shown, *Strickland*, 466 U.S.
> at 697, and the petitioner must demonstrate the underlying facts by a preponderance
> of the evidence, *Means v. State*, 120 Nev. 1001, 1012, 103 P.3d 25, 33 (2004).  We
> give deference to the district court's factual findings if supported by substantial
> evidence and not clearly erroneous but review the court's application of the law to
> those facts de novo. *Lader v. Warden*, 121 Nev. 682, 686, 120 P.3d 1164, 1166
> (2005).
>
> Benito-Victoria fails to demonstrate counsel was deficient in failing to obtain the
> memory expert.  The district court conducted an evidentiary hearing on this claim.
> Benito-Victoria does not contest the district court's finding that trial counsel sought
> the assistance of a psychological expert and that the trial court consequently ordered
> Dr. Mortillaro to conduct an examination of the victim at the defense's expense.
> Further, Benito-Victoria concedes that Dr. Mortillaro is a forensic psychologist
> with expertise in memory reliability and that he was unable to afford Dr.
> Mortillaro's fees.  Finally, substantial evidence in the record supports the district
> court's finding that counsel then consulted with a different psychologist whose non-
> memory-related opinion was not favorable to the defense and was thus not
> presented at trial.  Benito-Victoria has not demonstrated counsel could have
> obtained another memory expert whose fees he could afford.  Accordingly, he has
> failed to demonstrate counsel's actions were objectively unreasonable, and we
> therefore conclude the district court did not err in denying this claim.

1   ECF No. 12-3 at 2-4 (internal footnotes omitted).  The Nevada Court of Appeals' rejection of

2   Benito-Victoria's *Strickland* claim was neither contrary to nor an unreasonable application of

3   clearly established law as determined by the Supreme Court of the United States.

4          Prior to his trial, Benito-Victoria moved for a psychological evaluation of the victim to be

5   performed by Dr. Mark Chambers, explaining that he would pay the evaluation fees.  ECF No. 8-

6   2.  The trial court indicated that it "picks the psychologist that does the psyche evaluation" and

7   that it was going to use "somebody who [it had] confidence [was] truly independent."  ECF No.

8   2-2 at 49.  The trial court then "appoint[ed] Dr. Mortillaro to interview and evaluate the victim in

9   this case" at Benito-Victoria's expense.  ECF No. 8-5.

10         Following that appointment, Benito-Victoria filed an ex parte application for the court to

11  find him indigent for "the purpose of obtaining ancillary services, to wit: (1) the $3,000.00 fee of

12  Dr. Mortillaro required for the Court-ordered evaluation of the victim; (2) reasonable trial

13  testimony expenses of Dr. Mortillaro; and (3) reasonable trial testimony expenses of an expert on

14  repressed memory."[2]  ECF No. 8-7.  Regarding the third purpose, Benito-Victoria explained that

15  he was "not sure whether Dr. Mortillaro will be an expert on repressed memory or if [he will]

16  need to hire an outside expert."  *Id.* at 5.  The court denied Benito-Victoria's application to be

17  found indigent.  *See* ECF No. 8-8 at 3.  Benito-Victoria then moved for a continuance of his trial

18  date "to raise monies to hire Dr. Mortillaro."  *Id.*  Thereafter, court issued an order that "defense

19  counsel may use Dr. John Paglini to complete [the] psychiatric evaluation [of Gabriella]."  ECF

20  No. 8-9.

21  ────────────────

22         [2] This application was based on *Widdis v. Second Judicial Dist. Ct.*, 968 P.2d 1165, 1168
    (Nev. 1998) (holding that "a criminal defendant who has retained private counsel is nonetheless
    entitled to reasonable defense services at public expense based on the defendant's showing of
23  indigency and need for the services").  *See* ECF No. 8-7 at 3.

Approximately six years later, Benito-Victoria's trial counsel testified at Benito-Victoria's post-conviction evidentiary hearing. ECF No. 11-25 at 29.  Trial counsel explained that Dr. Mortillaro was originally supposed to be retained to interview Gabriella, but Benito-Victoria could not pay Dr. Mortillaro's fee, thereby necessitating the need to retain Dr. Paglini instead to evaluate Gabriella's credibility. *Id.* at 31, 42.  After Dr. Paglini reviewed the transcripts and police report and interviewed Gabriella, he told trial counsel that Gabriella "was in his opinion very credible," that "he did not believe that she had been coached," that Gabriella "was in the 99th percentile for trauma related stress," and that Gabriella "was in the 90th percentile for the suicide index." *Id.* at 31-34.  In sum, Dr. Paglini concluded that Gabriella's "behavior was consistent with someone as a victim of sexual abuse." *Id.* at 35.  When Benito-Victoria's trial counsel asked him what he could use as a defense, Dr. Paglini "said, well, there's really nothing I can give you, you know, from the interview process." *Id.* at 37.  Because Dr. Paglini's report would not have been beneficial to the defense, trial counsel declined to have Dr. Paglini put his findings into a report. *Id.*

The following colloquy then occurred between the State and Benito-Victoria's trial counsel at the post-conviction evidentiary hearing:

Q.    Did you ever consider calling a memory or an expert on memory in general, toddler memory, toddler amnesia?

A.    About a year before the trial, I believe it was March of 2010, I had sent an application to the Court, it was an ex parte application to declare Javier as an indigent for, you know, trial services.  And specifically I asked for number one the $3,000 that was needed for Dr. Mortillaro.  Then I asked for, you know, Dr. Mortillaro 'cause that was just for the report, originally it was going to be Dr. Mortillaro.  Then, to use him at trial hoping, you know, that this report was going to be favorable for the defense.  And the third thing I asked for was additional assistance for, I believe, repressed memory was the words that I used in my application.

Q.    What happened with that application?

A.     That application was denied, not approved.  And then I – based on that, I had filed a motion to continue the trial, which was heard in late April I believe of 2010, a motion to continue basically stating, look Javier we don't have the money.  He's ordered to pay for it.  It's 3,000 just for that.  Our motion for indigent, you know to get money, has been denied, so I need to continue this trial.

Q.     Did you ever consider hiring just a general expert on toddler memory after the application was denied?

A.     No.

Q.     Why not?

A.     Well, two reasons, first of all there was no money. . . . So I mean it was something that I didn't know of any, you know, any free experts.  And the money wasn't available. . . . I mean it would have been nice [to hire Dr. Chambers] but, unfortunately, the resources weren't there.  And my also thought process was, you know, we were all three years old.  Every juror was three years old.  We all have memories.  We all have things that we remember and don't remember.  So as far as getting an expert on the memory process I thought my jurors were, you know, quasi experts on memory, since they were all three and all have memory.  I know that was a big part of, you know, my defense, our defense was to show that she was just so young that she didn't remember things correctly.

Q.     Did you have concerns that if you hired an expert regarding toddler memory, toddler amnesia that the State would then present or hire an expert to counter your expert?

A.     Well, I anticipated that when I wrote my application, if we hired additional experts that the State most likely would hire, you know, their experts; you know battle of the experts.

Q.     Okay.  Did that play into your decision to ultimately not produce an expert?

A.     No, not really.  I mean we would liked to have had the expert.  I asked for money, we didn't have the money.  It would have been in my opinion beneficial to have an expert.

*Id.* at 38-40.  Benito-Victoria's trial counsel testified that because he was financially unable to

hire an expert, he tried to impeach Gabriella's recollection of certain events through cross-

examination and talked about "toddler memory and memories of very young children during [his] closing argument." *Id.* at 41-42.

Dr. Mark Chambers, a clinical and forensic psychologist, testified at the post-conviction evidentiary hearing that he reviewed records from Benito-Victoria's case to evaluate the reliability of Gabriella's report of abuse. ECF No. 11-25 at 4-5, 7.  Dr. Chambers explained that it can be problematic to have "a claimant who claimed to remember things that occurred when she was three years old" due to infantile amnesia, which "is simply that before a certain age most of us have no memory of our experiences." *Id.* at 9-10.  Dr. Chambers explained that Gabriella's report of "the first sexual abuse incident . . . occurred when she was about three years old and that is right on the borderline of childhood amnesia," and "[e]xperts generally will agree that memory is not reliable prior to the ages of about four or, maybe, three." *Id.* at 12.  Further, "a three-year-old has no concept of sexuality or sexual morality" and "the amount of detail that [Gabriella] reports about that incident is highly unlikely to be reliable." *Id.* at 12-13.  Thus, Dr. Chambers explained that "touching of the vagina is not going to have any specific meaning to her that would cause her to see that event as unusual or noteworthy," so "it's very unlikely that it would be remembered later, much later, 17 years later as an unusual or significant event." *Id.* at 14.  Dr. Chambers also testified that "this extra detail that comes out over that period of time from when it was first reported to the police, to the testimony at trial" is indicative of suggestibility, meaning "contamination from . . . exposure to information that then bec[a]me her memory." *Id.* at 16, 18.

In *Strickland*, the Supreme Court propounded a two-prong test for analysis of claims of ineffective assistance of counsel requiring the petitioner to demonstrate (1) that the attorney's "representation fell below an objective standard of reasonableness," and (2) that the attorney's

deficient performance prejudiced the defendant such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984).  A court considering a claim of ineffective assistance of counsel must apply a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689.  The petitioner's burden is to show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687.  Additionally, to establish prejudice under *Strickland*, it is not enough for the habeas petitioner "to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693. Rather, the errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687.

Where a state court previously adjudicated the claim of ineffective assistance of counsel under *Strickland*, establishing that the decision was unreasonable is especially difficult. *See Harrington*, 562 U.S. at 104–05.  In *Harrington*, the Supreme Court clarified that *Strickland* and § 2254(d) are each highly deferential, and when the two apply in tandem, review is doubly so. *Id.* at 105; *see also Cheney v. Washington*, 614 F.3d 987, 995 (9th Cir. 2010) (internal quotation marks omitted) ("When a federal court reviews a state court's *Strickland* determination under AEDPA, both AEDPA and *Strickland*'s deferential standards apply; hence, the Supreme Court's description of the standard as doubly deferential.")  The Supreme Court further clarified that, "[w]hen § 2254(d) applies, the question is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Harrington*, 562 U.S. at 105.

The Nevada Court of Appeals reasonably concluded that Benito-Victoria failed to demonstrate that his trial counsel was deficient. ECF No. 12-3.  As that court reasonably noted,

trial counsel moved for a psychological evaluation of Gabriella to be performed by Dr.

Chambers. ECF No. 8-2.  Dr. Chambers' testimony would have been beneficial to Benito-

Victoria's defense at trial.  Indeed, he testified at the post-conviction evidentiary hearing that

Gabriella's report of abuse was problematic due to her age at the time of the alleged abuse, her

level of detail given her lack of sexual morality at the time, and her addition of extra details at

the trial—as compared to her police interview—which suggested tainting of her memory. ECF

No. 11-25 at 9-10, 12-13, 16, 18.  But the trial court refused to let Dr. Chambers' interview

Gabriella. *See* ECF No. 2-2 at 49.  Instead, the court appointed Dr. Mortillaro. ECF No. 8-5.

After denying trial counsel's request for funds to pay Dr. Mortillaro, the trial court ordered

Benito-Victoria to use Dr. Paglini. *See* ECF Nos. 8-7, 8-8, 8-9.  Dr. Paglini, however, reported

that he would not be helpful to Benito-Victoria's defense. *See* ECF No. 11-25 at 31-35, 37.

Because trial counsel moved for a psychological evaluation of Gabriella and for fees to

pay for that evaluation, I cannot conclude that Benito-Victoria's trial counsel was deficient.

*Strickland*, 466 U.S. at 688.  In fact, trial counsel was ordered to use Dr. Paglini after his first

choice (Dr. Chambers) was denied.  And trial counsel consulted with Dr. Paglini about possible

defenses.  The fact that Dr. Paglini—the court-ordered psychologist—was not helpful to the

defense is not a reflection of trial counsel's representation.

Benito-Victoria appears to argue that Dr. Paglini was not qualified as a memory expert,

so his trial counsel should have also consulted with a forensic psychologist. ECF No. 1 at 39.

Defense counsel has a "duty to make reasonable investigations or to make a reasonable decision

that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691.  "In any

ineffectiveness case, a particular decision not to investigate must be directly assessed for

reasonableness in all the circumstances, applying a heavy measure of deference to counsel's

1  judgments." *Id.*  This duty includes investigating the defendant's "most important defense,"

2  (*Sanders v. Ratelle*, 21 F.3d 1446, 1457 (9th Cir. 1994)), and investigating and introducing

3  evidence that demonstrates factual innocence or evidence that raises sufficient doubt about the

4  defendant's innocence. *Hart v. Gomez*, 174 F.3d 1067, 1070 (9th Cir. 1999).

5      Dr. Paglini was hired to evaluate Gabriella's credibility, not to give potential testimony

6  on infantile amnesia or misleading post-event information. ECF No. 11-25 at 42.  But Benito-

7  Victoria's trial counsel testified that he did not hire an expert on memory because there was no

8  money to do so[3] and he believed the jurors would be receptive to the argument that a three-year-

9  old's memory is not reliable without the need for an expert. ECF No. 11-25 at 39.  This decision

10 to not hire a memory expert was reasonable, given that there were no funds to pay a memory

11 expert's fees. *Strickland*, 466 U.S. at 691.  Consulting with a memory expert would have been

12 futile under the circumstances. *See Harrington*, 562 U.S. at 107 (2011) ("Counsel was entitled to

13 formulate a strategy that was reasonable at the time and to balance limited resources in accord

14 with effective trial tactics and strategies.").

15     Benito-Victoria cites a case from the United States Court of Appeals for the Second

16 Circuit to support his argument that his trial counsel was deficient for failing to even consider

17 hiring a forensic memory expert. ECF No. 1 at 40-42 (citing *Bell v. Miller*, 500 F.3d 149, 157

18 (2d Cir. 2007) ("[W]here the only evidence identifying a criminal defendant as a perpetrator is

19 the testimony of a single witness, and where the memory of that witness is obviously impacted

20 by medical trauma and prolonged impairment of consciousness, and where the all-important

21

22

23

[3] In fact, in Benito-Victoria's application to be found indigent, his trial counsel explained that funds were needed to hire "an expert on repressed memory" in addition to the funds needed to pay for the psychological interview of Gabriella. ECF No. 8-7.  The request was denied. *See* ECF No. 8-8 at 3.

identification is unaccountably altered after the administration of medical drugs, the failure of defense counsel to consider consulting an expert to ascertain the possible effects of trauma and pharmaceuticals on the memory of the witness is constitutionally ineffective.")).  Because Benito-Victoria's trial counsel's motion for a psychological evaluation listed Dr. Chambers, a clinical and forensic psychologist, *see* ECF No. 8-2, and because Benito-Victoria's trial counsel testified at the post-conviction evidentiary hearing that he did not consult a forensic memory expert for financial reasons, *see* ECF No. 11-25 at 39, Benito-Victoria's argument that his trial counsel failed to even consider hiring a forensic memory expert lacks merit.

Because the Nevada Court of Appeals reasonably determined that Benito-Victoria's ineffective-assistance-of-counsel claim lacked merit, I deny Benito-Victoria federal habeas relief for Ground 2.

## IV.    CERTIFICATE OF APPEALABILITY

This is a final order adverse to Benito-Victoria.  Rule 11 of the Rules Governing Section 2254 Cases requires me to issue or deny a certificate of appealability (COA).  Therefore, I have *sua sponte* evaluated the claims within the petition for suitability for the issuance of a COA. *See* 28 U.S.C. § 2253(c); *Turner v. Calderon*, 281 F.3d 851, 864-65 (9th Cir. 2002).  A COA may issue only when the petitioner "has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).  With respect to claims rejected on the merits, a petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)).  For procedural rulings, a COA will issue only if reasonable jurists could debate (1) whether the petition states a valid claim of the denial of a

constitutional right and (2) whether the court's procedural ruling was correct. *Id*.  Applying these standards, I find that a certificate of appealability is unwarranted.

**V.     CONCLUSION**

I THEREFORE ORDER that the Petition for Writ of Habeas Corpus (**ECF No. 1**) **is DENIED**.

I FURTHER ORDER that the petitioner is denied a certificate of appealability.

I FURTHER ORDER the Clerk of the Court to enter judgment accordingly.

Dated: June 24, 2020.

_____
ANDREW P. GORDON
UNITED STATES DISTRICT JUDGE